## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO

|  |  |
|---|---|
| MAREN CRABILL, individually and on behalf of all others similarly situated,<br><br>                Plaintiff,<br><br>   v.<br><br>LCA-VISION, a corporation, also d/b/a LASIKPLUS, also d/b/a JOFFE DOCKET NO. MEDICENTER,<br><br>               Defendant. | Civil Action No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Maren Crabill ("Plaintiff"), by and through her attorneys, makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to allegations specifically pertaining to herself and her counsel, which are based on personal knowledge, against Defendant LCA-Vision ("LCA-Vision" or "Defendant"), also doing business as LasikPlus and Joffe MediCenter.

### <u>NATURE OF THE ACTION</u>

1. This is a class action that arises out of Defendant's false advertisements that falsely state consumers can purchase LASIK eye surgery for $250.

2. Defendant operates vision centers in numerous states under the name LasikPlus or Joffe MediCenter (collectively the "company"). In connection with these centers, Defendant has advertised, marketed, offered for sale, and sold LASIK surgery to consumers.

#### A. Defendant's LASIK Surgery Services

3. Defendant provides management and administrative services for all LasikPlus centers and Joffe MediCenters, including marketing, advertising, and public relations, billing and collection, the patient call center, patient scheduling, accounting, and other back-office support.

Each surgery center employs optometrists, technicians, center directors, and other support personnel, and contracts with affiliated independent medical professionals—ophthalmological surgeons—who perform LASIK surgery at one or more LCA centers.

4.      Defendant's surgery centers conduct eye examinations and consultations and perform LASIK surgery. LASIK surgery includes both laser-assisted in situ keratomileusis ("LASIK") and photorefractive keratectomy ("PRK"). The surgeries are refractive procedures that can correct myopia (difficulty seeing distance, commonly known as nearsightedness), hyperopia (difficulty seeing near objects, commonly known as farsightedness), and astigmatism (having an oval-shaped cornea, resulting in visual distortion), by reshaping the cornea, the clear window at the front of the eye. The purpose of LASIK surgery is to restore patients' eyesight to near 20/20 vision as measured on the Snellen eye chart.

5.      Defendant's centers typically use two types of lasers for surgery, a VISX excimer laser ("Traditional VISX Laser") and a Wavelight excimer laser ("Wavelight Laser"). The Traditional VISX Laser uses an older "broad beam" laser technology, whereas the Wavelight Laser is a more technologically-advanced "flying spot" laser, allowing it to produce faster and more precise corneal corrections. The Wavelight Laser is less likely to oblate (flatten the sides of) the cornea and is better able to reduce spherical aberrations. Defendant claims the Wavelight Laser can more effectively treat patients with higher prescriptions (worse eyesight) and larger pupils, and is less likely to result in post-operative complications such as reduced night vision and seeing halos around lights.

6.      Eligibility for vision correction surgery depends upon various factors, including a patient's prescription level, the thickness of the cornea, the size of the pupil, and the stability of the prescription. Defendant sets surgery price guidelines and parameters, including which prescriptions are eligible for certain pricing, but generally leave decisions as to a patient's

eligibility for LASIK surgery, and the appropriate type of surgery and laser, to the judgment of its surgeons and optometrists. Some of the surgeons who contract with Defendant limit the use of the Traditional VISX Laser to patients who are nearsighted with relatively low prescriptions. Others use the Traditional VISX Laser to correct the eyesight of patients with a wide array of prescriptions, including those who are farsighted and those with a high degree of correction. Defendant estimates the retail value of its LASIK surgery is $4,000, or $2,000 per eye.

### B. Defendant's Deceptive Business Practices

7. To induce consumers to purchase LASIK surgery, Defendant has disseminated, or has caused to be disseminated, various advertisements via television, radio, print, shopping flyers, email, and the Internet. LasikPlus advertisements convey that LASIK surgery is readily available to consumers for the promotional price of $250, or $250 per eye. Joffe MediCenter advertisements convey that LASIK surgery is readily available to consumers for the promotional price of $295. Defendant's advertisements have failed to disclose, or failed to disclose adequately, among other things, the requirements consumers must meet to be eligible for the LASIK surgery price promotions. These advertisements include, but are not limited to, the advertisements that are described below.

### C. Misleading LasikPlus Advertisements

8. Beginning in 2015, Defendant disseminated radio advertisements for LasikPlus with the following script:

> *Are you tired of paying for contacts and glasses year after year? Then come to LasikPlus. LasikPlus, America's most recommended LASIK provider, offers customized LASIK that treats nearsightedness, farsightedness, and astigmatism.*
>
> *Right now we're offering our best pricing, starting as low as $250. That's right, starting as low as $250.*

> *But only at LasikPlus, and only for a limited time. The LasikPlus surgeons have performed over 1.4 million procedures, and LasikPlus offers a lifetime satisfaction plan.*
>
> *For this limited time offer, call toll free 844-343-2020 or go to Lasik250.com to schedule your LASIK exam today. Call LasikPlus for limited time pricing starting as low as $250 at 844-343-2020 or visit Lasik250.com. Get your LASIK exam and our best price. This offer expires soon. So call 844-343-2020 before it's too late.*
>
> *Individual results may vary, restrictions apply, see details at Lasik250.com.*

9. Beginning in late 2016, Defendant disseminated radio advertisements for LasikPlus with the following script:

> *What if we told you there's a quick, easy way to get rid of the daily hassles of contacts and glasses? And even better… what if it could cost as little as $250? Well, it's all true… All thanks to LasikPlus. Now for a limited time only… LasikPlus can help fix your vision for only $250 per eye.*
>
> *With over 1.5 million procedures performed, LasikPlus will recommend the best treatment for your nearsightedness, farsightedness, or astigmatism… for our lowest price ever… $250!*
>
> *For more details about this amazing $250 offer, simply call 844-259-2020 or visit LASIK250.com to schedule your free LASIK exam.*
>
> *That's 844-259-2020 or visit Lasik250.com. LasikPlus… You won't believe your eyes… or our amazing $250 LASIK special!"*
>
> *Results may vary, restrictions apply, see details at Lasik250.com.*

10. Beginning in 2018, Defendant aired a LasikPlus advertisement on various radio stations with the following script:

> *For years you've been thinking about LASIK, you've been talking about LASIK, and now there's never been a better time do something about LASIK. Right now LasikPlus is offering LASIK starting at just $250 per eye.*
>
> *If you're nearsighted, farsighted, or have an astigmatism, LasikPlus can help fix your vision for only $250. Our best price ever. So get rid of the daily hassles of contacts and glasses. And enjoy the newfound freedom of LASIK from LasikPlus.*

> *Call 844-211-2020 today and schedule your free LASIK exam. Doctors Richard Maw and Dean Ellis together have performed over 85,000 procedures and are among the most experienced LASIK surgeons in Nebraska.* [Doctor and locality names are tailored to geographical markets.]
>
> *So take advantage of this amazing $250 price today. Call 844-211-2020 or visit lasik250.com.*
>
> *Results may vary, restrictions apply, see details at lasik250.com.*

11.    As shown above, the radio ads for LasikPlus failed to disclose that few people would qualify for the promotion or list any other price for the surgery. Nor did the ads provide any information about the eligibility requirements or the fact that farsighted patients were ineligible for the $250-price surgeries, apart from generic disclaimers spoken in the last sentence that "results may vary" and "restrictions apply." Consumers who visited lasik250.com, or called the phone numbers provided in the radio advertising, did not readily learn the eligibility requirements for the $250 surgery for the reasons explained below.

12.    Defendant also disseminated advertisements through the Internet radio site Pandora with the following script:

> *What if we told you there's a quick, easy way to get rid of the daily hassles of contacts and glasses? And even better… what if it could cost as low as Two Hundred and Fifty Dollars?*
>
> *Well, it's all true…all thanks to LasikPlus.*
>
> *Now… LasikPlus can help fix your vision for only Two Hundred and Fifty Dollars…our lowest price ever!*
>
> *Click or call 800-841-2020 to schedule your free LASIK exam.*
>
> *Results may vary, restrictions apply, see details at LasikPlusPandora.com*

As with the other radio ads, the Pandora radio commercials failed to disclose that few people would qualify for the promotion or list any other price for the surgery. Nor did the ads provide any information about the eligibility requirements, apart from the generic disclaimers at the end

of the commercials. Consumers who called the phone number provided in the radio advertising, or visited LasikPlusPandora.com—which redirects to a LasikPlus landing page—would not readily learn details about the requirements for the $250 surgery for the reasons explained below.

13.     Defendant also disseminated video commercials on television and the Internet for LasikPlus with the following voiceover script:

> *Frustrated with glasses or contact lenses? Now you can improve your vision to 20/20 with LASIK at LasikPlus, America's most highly recommended LASIK provider. Now, for a limited time, get LASIK at LasikPlus for as low as $250. Call now or go online to schedule your no obligation LASIK exam absolutely free. Visit mylasik250.com or call 1-844-226-2020 for your free LASIK exam.*

These ads failed to disclose that few people would qualify for the promotion or list any other price for the surgery. Nor did the ads provide any information about the eligibility requirements for the promotion. In the last few seconds of the advertisement, however, multiple disclaimers appeared on the screen in small print, stating:

> Individual results and recovery times may vary. 'Most recommended' claim based on 2013 LasikPlus study. See website for details. $250 per eye price for select prescriptions only. Not available at all locations. Other restrictions apply, see website for details. Drs. Alban, Groden, Karp and Straub among other LasikPlus surgeons, are included in the advertisement. FL Residents: The patient and any other person responsible for payment has a right to refuse to pay, cancel payment or be reimbursed for payment for any service, examination or treatment that is performed as a result of and within 72 hours of responding to the advertisement for the free, discounted fee or reduced fee service, examination or treatment. ©2014 LCA-Vision Inc. dba LasikPlus. All Rights Reserved.

These disclaimers were not made reasonably visible to Plaintiff or class members because of the vague language, the small text, and the brevity in which the disclaimers were displayed. This is especially true considering that the LASIK eye surgery being offered by Defendant is directed at consumers with less than perfect vision. Plaintiff did not see these disclaimers.

14. Beginning in 2017 and airing at least into 2019, Defendant disseminated video commercials on television and the Internet with testimonials from LasikPlus patients and the following script:

> PATIENT: *My life after LASIK with LasikPlus has been absolutely incredible.*
>
> ANNOUNCER: *People all over the country are singing the praises of LASIK from LasikPlus.*
>
> PATIENT: *Absolutely, 100%, I would recommend the procedure.*
>
> PATIENT: *Getting LASIK was the best thing I've ever done for myself, ever.*
>
> ANNOUNCER: *Now for a limited time only, LasikPlus can help fix your vision starting at $250 per eye, our best price ever.*
>
> PATIENT: *Knowing what I know now, I would have paid double to get the results that I got.*
>
> ANNOUNCER: *Since 1995, the surgeons at LasikPlus have performed over 1.5 million procedures, and can customize an all-laser LASIK procedure to help treat your vision.*
>
> PATIENT: *I wish I would have done it sooner.*
>
> PATIENT: *LASIK at LasikPlus was absolutely the best decision I've ever made.*
>
> ANNOUNCER: *Call 844-293-2020 or visit 250Lasik.com to schedule your free LASIK vision exam. LasikPlus, you won't believe your eyes.*

The visuals in the LasikPlus commercial reiterated and emphasized the $250 promotional



price by displaying the website address 250lasik.com throughout most of the 60-second advertisement, and by showing the following display for several seconds:

15.     The ads failed to include any other information about the cost or disclose that few people would qualify for the $250 price. The voice announcer failed to reveal any eligibility requirements for the promotion. In the last few seconds of the ad, however, various disclaimers



appeared in small print at the bottom of the screen:

The disclaimers stated:

> Individual results and recovery times may vary. Other restrictions apply. See website for details. $250 per eye price for selected prescriptions only. FL Residents: the patient and any other person responsible for payment has a right to refuse to pay, cancel payment or be reimbursed for payment for any service, examination or treatment that is performed as a discounted fee or reduced fee service, examination or treatment. ©2017 LCA-Vision, Inc. dba LasikPlus. All rights reserved.

These disclaimers were not made reasonably visible to Plaintiff or class members because of the vague language, the small text, and the brevity with which the disclaimers were displayed.  This is especially true considering that the LASIK eye surgery being offered by Defendant is directed at consumers with less than perfect vision.  Plaintiff did not see these disclaimers.

**D.    Defendant's Websites and Landing Pages**

16.    Consumers who go to Defendant's websites—including 250lasik.com, lasik250.com, mylasik250.com, and hulu250.com, among others—arrive on landing pages such as what is shown in the screen shot below:



17.    The 250lasik.com website landing page shown above fails to include information regarding eligibility requirements for the promotion, instead reiterating that LASIK surgery is

available starting at $250 and urging consumers to book a consultation. Consumers who click on "Book Free Consultation" are taken to a scheduling page, which fails to include any disclaimers about the promotional price, and prompts the customer to schedule a visit by selecting available dates and times from a website calendar.

18.     In some instances, Defendant's landing pages at lasikplus.com/affordable-lasik-250-discount, provide information about the eligibility requirements, but only if consumers scroll all the way to the bottom—well below several buttons for scheduling an appointment—and read through numerous disclosures, as shown below:



19.     The site's eligibility disclosure relating to the $250 surgery states:

♥$250 per eye price applies to patients with qualifying insurance coverage receiving treatment for up to -1.00 diopter with up to -1.00 diopter of astigmatism, performed with the traditional excimer laser (Advantage Plan not available). Prices range between $247 and $2,299 per eye based on prescription, laser, Advantage Plan selected as well as patient's insurance coverage. Previous Laser Vision Correction of any kind are ineligible for the $250 price offer. Not valid at LasikPlus locations in Ft. Lauderdale, FL, Oklahoma City, OK. Best price when compared with other national LASIK provider pricing advertised online as of 10/31/2014.

20.     The disclosure is not prominent nor in close proximity to the advertised price, nor is it clear and conspicuous and in a format consumers are likely to read. Instead, the disclosure appears on the page in small gray print on a black background. The only indication consumers receive regarding the disclosure is a small ♥ symbol next to the number $250 on the first screen of the landing page, and a corresponding heart symbol in the list of disclosures at the bottom of the next page.

21.     This disclaimer was not made reasonably visible to Plaintiff or class members and Plaintiff did not see this disclaimer.

22.     Defendant marketed the same $250 promotion subject to the same restrictions at least until 2021, when Plaintiff decided to purchase LASIK eye surgery from Defendant.  Indeed, Defendant still has the same disclaimer regarding the $250 promotion buried on its website today.

23.     In contrast to the small size of the disclosures, all of Defendant's landing pages contain prominent clickable links such as "Book Free Consultation Now" and "Take Candidacy Quiz Now." Consumers who click on "Book Free Consultation Now" are taken to a scheduling page, which does not include disclaimers about the promotional price, and prompts the customer to schedule a visit by selecting available dates and times from a website calendar. Consumers who click on "Take Candidacy Quiz Now" are asked five questions, none of which refers or relates to eligibility for the promotional price. Regardless of how the consumer answers,

finishing the quiz invariably takes the consumer to a page that states, "Congratulations! Your vision can most likely be corrected with a LASIK procedure." The "Congratulations" page directs the consumer to click on a scheduling button to arrange an office visit.

### E.    Very Few Consumers Qualify for and Undergo LASIK for the Advertised Price

24.    Consumers who respond to Defendant's advertising by calling the listed telephone numbers receive little or no information about qualifying conditions for the promotional-price surgery. While the company's call center once provided such eligibility information to consumers when asked, Defendant changed call center policies because it found that consumers who learned the promotional-price limitations were less likely to come in for a consultation. Defendant now instructs call center employees not to reveal eligibility requirements for promotional-price surgery—even if a consumer repeatedly asks—and to respond that only the doctor, after a consultation, can determine whether a consumer is eligible.

25.    Consumers who visit Defendant's centers for a consultation typically spend 90 minutes to two hours at the center. At the beginning of the consultation, Defendant's technicians check the prescription on the consumer's eyeglasses. Once technicians perform this quick task, they typically know whether the consumer qualifies for the promotional pricing. But if consumers inquire about their promotional-price eligibility at this stage in the consultation, Defendant's staff is, according to company policy, supposed to tell consumers that the price can only be determined after the consumer has undergone a more thorough exam and met with a company optometrist.

26.    Consumers undergo multiple eye exams during their consultation, including refraction, full pupil dilation, and a corneal topographical exam. Only after all examinations are complete and the patient has met with the optometrist do consumers learn whether they qualify for the promotional price, and the actual price they must pay for LASIK surgery. Consumers

learn that in order to qualify for the promotional price, they cannot be farsighted, or have a prescription greater than -1.00 diopter and -1.00 astigmatism. A -1.00 diopter prescription is roughly equivalent to eyesight of 20/30 or 20/40 vision as measured on the Snellen eye chart. 20/30 and 20/40 vision is classified by the World Health Organization as "near-normal vision," and is good enough to legally drive in the U.S. without wearing glasses or contacts.

27.    People with "near normal vision" are not generally in the market for LASIK eye surgery.  Thus, Defendant is offering a price that no consumers in the market for LASIK eye surgery actually qualify for.

28.    If consumers ask why they cannot receive LASIK surgery for the promotional price, Defendant's staff often say that the Traditional VISX Laser used in surgery available at the promotional price is unsafe for patients with their prescription, or would leave them with faulty vision. In some instances, staff tell consumers that the Traditional VISX Laser only treats to prescriptions as strong as -1.00, or that the consumer's prescription is several times worse than what the Traditional VISX Laser can treat. While true in certain cases, Defendant's surgeons routinely use the Traditional VISX Laser for surgery on patients with eyesight worse than -1.00, including patients with prescriptions of -4.00 to -6.00.

29.    Only 6.45% of consumers who visit Defendant's centers for a consultation qualify for the promotional price for both eyes. According to one LasikPlus doctor, at his center, "we treat at least a couple of patients every month for the $250, so it is available, albeit for a very very small number of qualified patients." Even for those who qualify for Defendant's promotional pricing, Defendant charges $250 or $295 per eye, not for the entire procedure. Those who only qualify for the promotion in one eye are quoted prices ranging from $695 to $2,295 for the other eye, depending on insurance, prescription, and choice of laser.

30. In many instances, Defendant's staff discourage consumers who qualify for the promotional price from taking advantage of the offer. Defendant's staff tell consumers that the more expensive Wavelight Laser is safer and more effective, even though Defendant permits its surgeons to use the Traditional VISX Laser to perform surgery on patients with high corrections who do not qualify for the promotional price.

31. In some instances, Defendant's staff sometimes tell consumers that the Traditional VISX Laser is an older technology that can leave a patient with poor night vision and halos around lights. At other times, Defendant's staff tell consumers that they may need "touch up" enhancements at a cost of $1,000 per eye after the initial surgery with the Traditional VISX Laser because the surgery may not result in 20/20 vision, or because a person's eyesight changes over time.

32. In most instances, consumers who qualify for Defendant's promotional price choose not to undergo LASIK surgery via the Traditional VISX Laser. Consequently, only 1.3% of consumers who receive a consultation at Defendant's centers undergo LASIK surgery for the promotional price.

33. Defendant loses money on every LASIK surgery performed for $250 or $295 per eye. Defendant's revenue only exceeds their advertising costs if their promotional advertisements attract customers who do not qualify for the promotional price. The primary target of Defendant's advertising is not consumers who can obtain surgery for the promotional price, but rather customers who will pay the standard LasikPlus price of $1,800-$2,295 per eye.

34. Defendant has formulated training policies, guides, and instructional videos to teach personnel how to convert consumers attracted by promotional-price advertising to consumers willing to purchase LASIK surgery at the regular retail price. These guides instruct staff how to "overcome" patient objections and switch them to the company's regular-price

LASIK surgery. Recommended approaches include touting the experience and expertise of the surgeons, the quality and safety of the equipment, the life-changing benefits of not wearing glasses or contacts, and the availability of extended financing that can make Defendant's surgery "affordable" even when it costs thousands of dollars instead of $250 or $295.

35. Defendant has instructed company personnel in how to "manage" patients who come in expecting to get LASIK surgery for the promotional price, and "transition" them to full-priced LASIK. In at least one instance, personnel were directed to wait until after the patient eye examinations were complete, and the staff had an opportunity to discuss the benefits of LASIK surgery and "make the patient really want it," before revealing that the patient did not qualify for the promotional pricing.

36. The true aim of Defendant's advertising is not to offer LASIK surgery for $250 or $295 but to obtain contacts, or leads, for persons interested in buying services of the type advertised, and convert them to higher-priced surgery. In the words of Defendant's company personnel, the goal of the promotional-price advertising is to "make the phones ring" and "get people in the door," and then convert as many as possible to Defendant's standard pricing.

37. For consumers who did not qualify for the advertised promotion—the vast majority of consumers—Defendant's promotional price offer is not a bona fide offer, but rather an alluring but insincere offer to sell a service that Defendant in truth does not intend or want to sell. These consumers were harmed in that they wasted 90 minutes to two hours of their time, after being lured into sitting for a consultation by Defendant's deceptive advertising.

**F.** **Consumers Are Misled by Defendant's Advertising**

38. Defendant has received hundreds of comments and complaints from consumers stating that its advertising is misleading and deceptive. Consumer complaints and reviews include the following statements, among many others:

(a) "They advertise a great price but then you find it only applies if you barely have any eyesight issues. For people with actual eyesight issues, the price is really closer to $4000. That's like a restaurant offering a hamburger for $2.50 but when you get there they explain the burger is the size of an M&M but if you want a regular sized burger it's going to cost you $40.00[.]"

(b) "Misleading advertising. Period. $250 per eye 'if you qualify.' I expected maybe a higher price. 2 times higher, 3 times higher. Well, the quote was about 12 times higher. Clearly, this is a bait and switch tactic. It's misleading and you don't get the 2 plus hours you spend there back."

(c) "Get you in on a special that no one looking into Lasik qualifies for. Wouldn't discuss pricing over the phone other than deals that once you are there you learn, anyone over a 1.0 prescription does not qualify. Spent 20 minutes in waiting room and appointment took over an hour and a half. Quoted $3,500 for a 1.75 prescription. Disappointed, feel there are some deceptive business tactics at work[.]"

(d) "Based on their advertising I booked a consultation and exam. Once the exam was completed, I was told I was a perfect candidate for the Lasik surgery. I was then told the cost would be $4,200.00. I questioned what about the $250.00 per eye advertised and was told that was for an old lazer [sic], 23 years old that they don't use anymore."

39. Defendant has also received complaints from company personnel that their advertising misleads consumers, with some staff members referring to the advertising message as "bait and switch," "somewhat misleading," "unrealistic," and promoting the "false dream" of LASIK surgery for $250.

40. Defendant's internal company communications contain the following statements, among others, from company personnel:

(a) "It's simple bait and switch and it works. Let's not start acting like we're doing it for the sa[k]e of the world. If you want honesty in advertising we should advertise affordability via financing –but when does any corporation advertise honestly?"

(b) "I agree that the $250 promotion is deceptive and not consistent with what we are or what we want to be."

(c) "Our advertising here in KC mentions "starting" at $250 once in the commercial. It mentions 3 times about call now/schedule now to get this $250 treatment. It definitely makes you believe that we offer treatment for

16

only $250 ALL THE TIME and IT IS EASY TO GET THE $250 TREATMENT."

(d) "So we have had 3 patients today mention that they had talked to the call center about the $250 promotion and they felt misled about the promotion. This is a common occurrence in the Minneapolis market, as we promote $250 very strongly. They asked what percentage of patients actually qualify and they were told lots of people qualify. These patients came from 45 min to 1 hour away and took off work to come in. They felt that we lied to them by telling them they have a good chance they qualify for the $250 promotion and were upset that they drove all the way here, only to not qualify."

(e) "I know you guys [in marketing] want to get people in the door to try to convince them to have surgery with us anyway, but many of our people are coming from 2+ hours away and feel like we wasted their time driving out to see us when they don't qualify for $250 and that's the only reason they came to see us instead of seeing their local provider."

(f) "It doesn't help that we come out as liars with 'come get your lasik for $250.' It angers a lot of patients when they find out our price."

41.    Defendant's' personnel have complained to the company's marketing department that disclosures about the company's promotions are not always clear and conspicuous. One center director stated, "I know that we do have a disclaimer in the very small print on the bottom about qualifying Rx's, but it is hard to tell/find. A heart next to something is not usually an indication of a bullet in the small print."

42.    Defendant's doctors have also complained internally that the radio advertising misrepresents that they treat farsighted (hyperopic) patients for the promotional price, and, as a result, such patients come in with the wrong "expectations." One doctor told Defendant's marketing department, "I think if we continue to use this language, we'll need to have a $250/eye offer for hyperopic treatments, otherwise this can and will be interpreted as a 'bait and switch' ploy."

43.    Defendant is aware that many consumers and company personnel view the company's advertisements as misleading. Company doctors and center directors have informed

Defendant that consumers complain that they feel misled, and share negative consumer reviews with him. When told of one consumer review alleging "[b]ait and-switch" tactics, Defendant's leadership advised company staff to "get lots of new, positive online reviews and hopefully 'bury it.'"

44.     Despite the complaints about the advertising, Defendant expanded the use of the promotional-price advertising because the company's marketing executives determined that the low-price ads are more effective at bringing patients in for consultations—and ultimately converting them to regular-priced LASIK surgery—than advertising the typical or average price for Defendant's surgery.

45.     According to one of Defendant's marketing executives, while the advertising causes some "push-back" from deceived consumers, this is "off-set by the increase in overall bookings."

46.     When Defendant fully rolled out promotional-price advertising, consumer bookings increased by approximately 33% and overall treatment revenue increased by approximately 47%, even as overall conversion rates (the percentage of consumers examined who decide to get LASIK surgery) declined.

47.     In defending the promotional-price advertising to doctors who said that it was misleading, some LCA personnel remarked that "advertising low price is the 'dirty little secret' in our business ... that works!"

### G.     FTC's January 2023 Action Against Defendant

48.     In January 2023, the FTC took action against Defendant for allegations that are substantially identical to this complaint.  *In the Matter of LCA-Vision Inc. d/b/a LasikPlus*, FTC Matter/File Number: 1923157.

49.    According to the FTC's administrative complaint, Defendant's "false advertisements" as described above constitutes violations of Section 5(a) and 12 of the FTC Act, 15 U.S.C. § 45(a), which prohibits "unfair or deceptive acts or practices in or affecting commerce."

50.    Acts or practices are unfair under Section 5 of the FTC Act if they cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition. 15 U.S.C. § 45(n).

51.    On the same date that the FTC complaint was filed, Defendant was ordered to pay $1,250,000 as part of a civil penalty for these violations of federal law.

52.    Even after Defendant was forced to pay this civil penalty to the FTC, Defendant's Lasik eye surgery practitioners still advertise the $250 promotional price on Yellow Pages as shown in the example below:



## **PARTIES**

53.    Plaintiff Maren Crabill is a citizen of Massachusetts who resides in Leominster, Massachusetts.  In or around May 2021, Ms. Crabill purchased LASIK surgery from LCA in Hartford, Connecticut.  Ms. Crabill viewed the above referenced advertisements and understood

these advertisements as a representation from Defendant that Ms. Crabill would only pay approximately $250 per eye for LASIK surgery. These representations were material in Ms. Crabill's decision to purchase LASIK surgery from LCA. However, once Ms. Crabill had crossed state lines from her home in Massachusetts and arrived in Hartford, Connecticut for her surgery consultation, she discovered she would have to pay approximately $4,000, which she ultimately paid after considering the trouble she had already faced in scheduling and travel. Had Ms. Crabill known the true cost of the surgery, she would not have had her LASIK surgery performed by Defendant.

54. Ms. Crabill did not see any disclaimer which put her on notice of the true cost of the LASIK surgery that Defendant was offering.

55. Defendant LCA-Vision ("LCA-Vision"), also doing business as LasikPlus and Joffe MediCenter, is an Ohio corporation with its principal office or place of business at 7840 Montgomery Road, Cincinnati, Ohio 45326.

## JURISDICTION AND VENUE

56. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendant.

57. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because a substantial portion of the events that gave rise to this cause of action occurred here.

58. This court has personal jurisdiction over Defendant because a substantial portion of the events giving rise to this cause of action occurred here.

## **CLASS REPRESENTATION ALLEGATIONS**

59.     Plaintiff seeks to represent a class defined as all consumers who purchased LASIK surgery from LCA (the "Class").

60.     Plaintiff also seeks to represent a subclass defined as all Class Members who purchased LASIK surgery from LCA in the state of Connecticut (the "Connecticut Subclass") (collectively with the Class, the "Classes").

61.     Subject to additional information obtained through discovery, the foregoing class definitions may be modified or narrowed by an amended complaint, or at class certification, including through the use of multi-state subclasses to account for material differences in state law, if any.

62.     Members of the Classes are so numerous that their individual joinder herein is impracticable.  On information and belief, members of the Class and Connecticut Subclass number in the millions.  The precise number of Class members and their identities are unknown to Plaintiff at this time but may be determined through discovery.  Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant and third-party retailers and vendors.

63.     Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members.  Common legal and factual questions include but are not limited to whether Defendant's conduct constitutes unfair and deceptive business practices.

64.     The claims of the named Plaintiff are typical of the claims of the Class in that the named Plaintiff, like all class members, reasonably relied on Defendant's representations about the price of LASIK surgery and suffered injury as a result of Defendant's uniform conduct.

21

65.     Plaintiff is an adequate representative of the Classes because her interests do not conflict with the interests of the Class members she seeks to represent, she has retained competent counsel experienced in prosecuting class actions, and she intends to prosecute this action vigorously.  The interests of Class members will be fairly and adequately protected by Plaintiff and her counsel.

66.     The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class members.  Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

**COUNT I**
**Violation of the Connecticut Unfair Trade Practices Act (CUTPA),**
**Conn. Gen. Stat. § 42-110(a), *et seq.***

67.     Plaintiff incorporates by reference and re-allege herein all paragraphs alleged above.

68.     Plaintiff brings this claim individually and on behalf of the members of the Connecticut Subclass against Defendant.

69.     Defendant is in the trade or business of operating and managing LASIK, PRK, and monovision treatment centers.

70.     Defendant's conduct offends public policy as established by statutes, the common law, or other established concept of unfairness including but not limited to Sections 5(a) and 12of the Federal Trade Commission Act.

71.     Defendant's conduct constitutes a pattern and practice in that Defendant has misrepresented the price of its LASIK surgery and deceptively failed to disclose eligibility limitations for the promotional price of the LASIK surgery to Connecticut Subclass Members.

72.     Defendant's conduct was immoral, unethical, oppressive, and unscrupulous.

73.     Defendant's conduct caused substantial injury to Plaintiff and Connecticut Subclass members in that they paid prices that were several times the amount that was represented to them.

74.     As a result, Plaintiff and Connecticut Subclass members have suffered an ascertainable loss.

75.     Plaintiff will mail a copy of this Complaint to the Attorney General and the Commissioner of Consumer Protection.

## COUNT II
### Unjust Enrichment

76.     Plaintiff incorporates by reference and re-allege herein all paragraphs alleged above.

77.     Plaintiff brings this claim individually and on behalf of the members of the Classes against Defendant.

78.     Plaintiff and members of the Classes conferred benefits on Defendant by purchasing LASIK surgery from Defendant.

79.     Defendant has been unjustly enriched in retaining the revenues derived from Plaintiff's and Class and Subclass Members' purchases of the LASIK surgery.  Retention of those moneys under these circumstances is unjust and inequitable because of Defendant's

unlawful misrepresentation of the price that Class members would pay as well as Defendant's deceptive failure to disclose eligibility limitations for the promotional price. These misrepresentations and omissions caused injuries to Plaintiff and members of the Classes because they would not have purchased the LASIK surgery from Defendant if the true facts about the surgery were known.

80.     Because Defendant's retention of the non-gratuitous benefits conferred on them by Plaintiff and members of the Classes is unjust and inequitable, Defendant must pay restitution to Plaintiff and members of the Classes for its unjust enrichment, as ordered by the Court.

**COUNT III**
**Fraud**

81.     Plaintiff incorporates by reference and re-allege herein all paragraphs alleged above.

82.     Plaintiff brings this claim individually and on behalf of the members of the Classes against Defendant.

83.     As discussed above, Defendant provided Plaintiff and members of the Classes with false or misleading material information about the LASIK surgery.

84.     Specifically, Defendant unlawfully misrepresented the price that Class members would pay. Defendant also deceptively failed to disclose eligibility limitations for the promotional price. Defendant's misrepresentations were made knowingly in order to encourage Plaintiff and members of the Classes to purchase the LASIK surgery at inflated prices.

85.     These misrepresentations were made with knowledge of their falsehood.

86.     The misrepresentations made by Defendant, upon which Plaintiff and members of the Classes reasonably and justifiably relied, were intended to induce and actually did induce Plaintiff and members of the Classes to purchase LASIK surgery that they otherwise would not have or at least pay substantially more for the LASIK surgery than they would have.

87.     The fraudulent actions of Defendant caused damage to Plaintiff and members of the Classes in the form of price premiums and are entitled to damages and other legal and equitable relief as a result.

## COUNT IV
## Fraudulent Omission

88.     Plaintiff incorporates by reference and re-allege herein all paragraphs alleged above.

89.     Plaintiff brings this claim individually and on behalf of the members of the Classes against Defendant.

90.     This claim is based on Defendant's unlawful misrepresentation of the price that Class members would pay for LASIK surgery as well as Defendant's deceptive failure to disclose eligibility limitations for the promotional price of the LASIK surgery as described above.

91.     The false and misleading omissions were made with knowledge of their falsehood.  Defendant is a nationwide business that is well aware of the relevant federal and state consumer protection laws.  Nonetheless, Defendant continued to materially misrepresent the price of the LASIK surgery.

92.     The false and misleading omissions were made by Defendant, upon which Plaintiff and members of the Classes reasonably and justifiably relied, and were intended to induce and actually induced Plaintiff and members of the Classes to purchase the LASIK surgery.

93.     The fraudulent actions of Defendant caused damage to Plaintiff and members of the Classes, who are entitled to damages and punitive damages.

<u>COUNT V</u>
**Breach Of Express Warranty**

94.      Plaintiff incorporates by reference and re-alleges herein all paragraphs alleged

above.

95.      Plaintiff brings this claim individually and on behalf of members of the Classes

against Defendant.

96.      In connection with the sale of the LASIK surgery, Defendant issued written

warranties.  Defendant, as the seller expressly warranted that the LASIK surgery were being

offered for a promotional price.

97.      Defendant's express warranties and its affirmations of fact and promises made to

Plaintiff and the members of the Classes regarding the LASIK surgery became part of the basis

of the bargain between Defendant and Plaintiff and the Class, thereby creating an express

warranty that the LASIK surgery would conform to those affirmations of fact, representations,

promises, and descriptions.

98.      The LASIK surgery does not conform to the express warranties.

99.      Plaintiff and members of the Classes were injured as a direct and proximate result

of Defendant's breach because (a) they would not have purchased the LASIK surgery if they had

known the truth actual price of the LASIK surgery; (b) they paid a price premium for the LASIK

surgery based on Defendant's express warranties; and (c) the LASIK surgery did not have the

characteristics, uses, or benefits as promised.

100.     As a result, Plaintiff and members of the Class have been damaged either in the

full amount of the purchase price of the LASIK surgery or in the difference in value between the

LASIK surgery as warranted and the LASIK surgery as sold.

101.     On March 28, 2023, Plaintiff sent a notice letter to Defendant consistent with

U.C.C. 2-607(3)(A).  The letter was sent on behalf of Plaintiff and all other persons similarly

situated.

**RELIEF DEMANDED**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks

judgment against Defendant, as follows:

a.     For an order certifying the nationwide Class, and the Connecticut Subclass under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class and the Connecticut Subclass and Plaintiff's attorneys as Class Counsel to represent the Classes;

b.     For an order declaring that Defendant's conduct violates the laws referenced herein;

c.     For an order finding in favor of Plaintiff, the nationwide Class and the Connecticut Subclass on all counts asserted herein;

d.     For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

e.     For prejudgment interest on all amounts awarded;

f.     For an order of restitution and all other forms of equitable monetary relief;

g.     For an order enjoining Defendant from continuing the illegal practices detailed herein and compelling Defendant to undertake a corrective advertising campaign; and

h.     For an order awarding Plaintiff and the Class and Connecticut Subclass their reasonable attorneys' fees and expenses and costs of suit.

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all claims so triable.

Dated:  May 12, 2023

Respectfully submitted,

**CLIMACO WILCOX PECA & GAROFOLI CO., LPA**

By:      */s/ Scott D. Simpkins*
Scott D. Simpkins (0066775)
55 Public Square, Suite 1950
Cleveland, Ohio 44113
Telephone: (216) 621-8484
Facsimile:  (216) 771-1632
sdsimp@climacolaw.com

**BURSOR & FISHER, P.A.**
Julian C. Diamond (*pro hac vice* forthcoming)
888 Seventh Avenue
New York, NY 10019
Tel:  (646) 837-7150
Fax: (212) 989-9163
E-Mail:  jdiamond@bursor.com

**BURSOR & FISHER, P.A.**
Yeremey O. Krivoshey (*pro hac vice* forthcoming)
1990 North California Blvd. Suite 940
Walnut Creek, CA 94596
Tel:  (925) 300-4455
Fax: (212) 989-9163
E-Mail:  ykrivoshey@bursor.com

*Attorneys for Plaintiff*