# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

| | | |
|---|---|---|
| MAREN CRABILL, individually and on behalf of all others similarly situated, | : : : | Case No. 1:23-cv-280 |
| Plaintiff, | : : | Judge Timothy S. Black |
| vs. | : : | |
| LCA-VISION, a corporation, also d/b/a LASIKPLUS, also d/b/a JOFFE MEDICENTER, | : : : : | |
| Defendant. | : : | |

## ORDER GRANTING MOTION TO DISMISS
## FOR LACK OF ARTICLE III STANDING

This civil action is before the Court on Defendant's motion to dismiss and to strike the class allegations (Doc. 11), the parties' responsive memoranda (Docs. 14, 17), and Plaintiff's Notice of Supplemental Authority (Doc. 18).

On May 12, 2023, Plaintiff Maren Crabill ("Plaintiff") brought this civil class action against Defendant LCA-Vision, Inc. d/b/a LasikPlus and Joffe Medicenter ("Defendant" or "LCA"), alleging the following claims: violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110(a), *et seq.*; unjust enrichment; fraud; fraudulent omission; and breach of express warranty. (Doc. 1). On September 10, 2023, Plaintiff filed a First Amended Complaint, which filing provided additional information regarding the parties and allegations but did not amend the claims. (Doc. 10).

## I.  BACKGROUND

Defendant is an Ohio corporation that operates vision/surgery centers in numerous states under the names LasikPlus or Joffe MediCenter.  (Doc. 10 at ¶ 5).  Specifically, Defendant provides management and administrative services for all LasikPlus centers and Joffe MediCenters.  (*Id*. at ¶ 6).  These services include, *inter alia*, marketing and advertising, billing, accounting, patient scheduling, and running the patient call center.  (*Id*.)

LasikPlus and Joffe MediCenters (collectively, the "surgical centers") offer services including eye examinations, consultations, and LASIK surgery.  (*Id*. at ¶ 7).  The surgical centers employ optometrists, technicians, and other support personnel, as well as contracting with affiliated independent medical professionals—ophthalmological surgeons—who perform LASIK surgery.  (*Id*.)  LASIK surgery is a procedure that can correct myopia (nearsightedness), hyperopia (farsightedness), and astigmatism (having an oval-shaped cornea, resulting in visual distortion), thereby restoring a patient's eyesight to near 20/20 vision as measured on the Snellen eye chart.  (*Id*.)

The surgical centers typically use two types of lasers for surgery, a VISX excimer laser ("Traditional VISX Laser") and a Wavelight excimer laser ("Wavelight Laser").  (*Id*. at ¶ 8).  The Traditional VISX Laser uses an older "broad beam" laser technology, whereas the Wavelight Laser is a more technologically-advanced "flying spot" laser, allowing it to produce faster and more precise corneal corrections.  (*Id*.)  Defendant claims the Wavelight Laser can more effectively treat patients with higher prescriptions

2

(worse eyesight) and larger pupils, and is less likely to result in post-operative complications such as reduced night vision and seeing halos around lights. (*Id.*)

Eligibility for vision correction surgery depends upon various factors, including a patient's prescription level, the thickness of the cornea, the size of the pupil, and the stability of the prescription. (*Id.* at ¶ 9). Defendant sets surgery price guidelines and parameters, including which prescriptions are eligible for certain pricing, but generally leave decisions as to a patient's eligibility for LASIK surgery, and the appropriate type of surgery and laser, to the judgment of its surgeons and optometrists. (*Id.*) Some of the surgeons who contract with Defendant limit the use of the Traditional VISX Laser to patients who are nearsighted with relatively low prescriptions. (*Id.*) Others use the Traditional VISX Laser to correct the eyesight of patients with a wide array of prescriptions, including those who are farsighted and those with a high degree of correction. (*Id.*) Defendant estimates the retail value of its LASIK surgery is $4,000, or $2,000 per eye. (*Id.*)

Starting in or around 2015, Defendant began advertising a limited-time promotional offer for LASIK surgery at a reduced cost. (*Id.* at ¶¶ 10-11). These advertisements were disseminated through television, radio, print, shopping flyers, email, and the Internet. (*Id.* at ¶ 10).

Specifically, Defendant advertised LASIK surgery available to patients for as little as $250 (LasikPlus) or $295 (Joffe MediCenters). (*Id.*) Additionally, the advertisements all noted that restrictions applied to the offer, but did not specify adequately (if at all) the nature of those restrictions nor provide sufficient information regarding eligibility

3

requirements. (*Id*.) Instead, the advertisements typically instructed interested consumers to call the surgical centers or to visit their website to schedule a free consultation and/or receive further details about the promotional offer. (*Id*. at ¶¶ 11-22).[1]

As it would turn out, the eligibility requirements for Defendant's lowest advertised prices of $250 or $295 were fairly restrictive. That is, to qualify for the lowest price, the patient could not be fair-sighted nor have eyesight worse than -1.00. (*Id*. at ¶ 29). In other words, the promotional price was essentially available only to those who were near-sighted and had "near-normal vision." (*Id*.) Additionally, the promotional price only applied to surgeries done using the Traditional VISX Laser. (*Id*. at ¶ 31). And although the surgical centers' websites did contain these restrictions and eligibility disclosures, the information was contained in the fine print at the bottom of the page. (*Id*. at 19-22). Additionally, while Defendant's call centers initially provided eligibility information to consumers who inquired by phone, Defendant changed its call center policies after finding that consumers who learned the promotional-price limitations were less likely to schedule a free consultation. (*Id*. at ¶ 27). As a result, Defendant instructed call center employees to respond to any inquiries regarding eligibility by telling the caller that only the doctor, after a consultation, can determine whether a consumer is eligible. (*Id*.)

As to the free consultations, patients typically spent anywhere from 90 minutes to two hours at the surgery centers and underwent multiple types of eye examinations before

---

[1] Plaintiff's Amended Complaint contains the full script of Defendant's radio and television advertisements, as well as the content and accompanying screenshots of Defendant's printed advertisements. (Doc. 10 at ¶¶ 11-22). The Court incorporates this information by reference.

4

meeting with the optometrist to learn whether or not they qualified for the promotional pricing. (*Id*. at ¶¶ 28-29). Per company policy, Defendant's staff did not advise patients as to eligibility for the promotional price before the end of the consultation, even if it were evident at an earlier stage that the patient would not qualify. (*Id*.)

Ultimately, only 6.45% of patients who visited Defendant's surgery centers for the free consultation qualified for the promotional price for both eyes. (*Id*. at ¶ 32). Patients who qualified for the promotion in only one eye (due to having worse eyesight in one eye than the other) were offered the promotional price for the qualifying eye and then quoted a higher price in the range of $695 to $2,295 for the other eye. (*Id*.) Moreover, even for qualifying patients, Defendant's staff would sometimes discourage undergoing the procedure using the Traditional VISX Laser and promote the (more expensive) Wavelight Laser as a safer and more effective option, thereby talking the patient out of the promotional offer. (*Id*. at ¶¶ 33-34).

In January 2023, the Federal Trade Commission ("FTC") prepared a draft complaint, alleging that the same advertisements at issue in the instant case gave the FTC "reason to believe that [Defendant] ha[d] violated the provisions of the Federal Trade Commission Act," and that "[t]he acts and practices of [Defendant] as alleged in [the FTC] complaint constitute unfair or deceptive acts or practices, and the making of false advertisements, in or affecting commerce, in violation of Sections 5(a) and 12 of the Federal Trade Commission Act." (Doc. 11-1 at 2-22). Ultimately, Defendant entered into an Agreement Containing Consent Order, proposing, *inter alia*, that Defendant would pay $1.25 million to defrauded consumers. (*See id.* at 23, 27). In March 2023, the

5

FTC issued the complaint and approved the Consent Order. (*Id*. at 23-34). Notably, however, the FTC viewed the class of defrauded consumers as those "who (i) visited [Defendant's] centers for a LASIK consultation from January 1, 2014, to August 30, 2020, (ii) were found to be medically eligible for LASIK, <u>and (iii) **declined** having LASIK</u>." (*Id*. at 28-29) (emphasis added). In other words, the FTC viewed defrauded consumers as those individuals who were effectively misled into expending the time and effort to visit Defendant's surgical centers, with the expectation of receiving LASIK for under $300, <u>and</u> who opted not to have the surgery upon learning the actual cost.

On May 12, 2023, Plaintiff brought this civil action, alleging that she and others similarly situated also constitute a class of defrauded consumers. (Docs. 1, 10). In contrast to the FTC's defined group of defrauded consumers, however, Plaintiff and the proposed class are patients who were misled by Defendant's advertisements <u>but nevertheless purchased LASIK from Defendant</u>. (Doc. 10 at ¶¶ 56, 66).

Specifically, Plaintiff (a citizen of Massachusetts) states that she viewed Defendant's promotional advertisements "and understood these advertisements as a representation from Defendant that [Plaintiff] would only pay approximately $250 per eye for LASIK surgery." (Doc. 10 at ¶ 56). Plaintiff states that the representations made in the advertisements were "material to her decision to purchase LASIK surgery from [Defendant]." (*Id*.) Accordingly, on April 30, 2021, Plaintiff traveled from her home in Massachusetts and arrived in Hartford, Connecticut (presumably the closest location to her) for her surgery consultation. (*Id*. at ¶ 57). Plaintiff states that she participated in an extended consultation, only to learn at the end that "she did not qualify for the $250 per

6

eye LASIK surgery … [and] that due to her precise circumstances, her price would be $4,910." (*Id*. at ¶ 58). However, Defendant offered Plaintiff a $1,000 discount, which offer was time-limited and would expire if not accepted by May 15, 2021. (*Id*.)

On May 14, 2021, Plaintiff contacted Defendant and accepted the discounted offer. (*Id*. at ¶ 59). Plaintiff states that she "made this decision after considering the trouble she had already faced in scheduling and travel and because she felt pressure and fear that if she did not get the surgery at the exact time that she did, she would lose the discount that was being offered." (*Id*.) However, Plaintiff alleges that, "[h]ad [she] known the true cost of the surgery, she would not have had her LASIK surgery performed by Defendant or would not have been willing to pay as much." (*Id*. at ¶ 60).

Defendant moves to dismiss Plaintiff's claims "for lack of Article III standing and failure to state a claim, and striking the class allegations contained in Plaintiff's Amended Complaint to the extent any such claims survive dismissal." (Doc. 11).

## II. STANDARD OF REVIEW

### A. Article III Standing – Fed. R. Civ. P. 12(b)(1)

Under Fed. R. Civ. P. 12(b)(1), a defendant may move to dismiss a complaint for lack of subject matter jurisdiction. The plaintiff bears the burden of establishing the Court's jurisdiction. *Glob. Tech., Inc. v. Yubei (XinXiang) Power Steering Sys. Co.*, 807 F.3d 806, 810 (6th Cir. 2015). "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3).

"Whether a party has standing is an issue of the court's subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1)." *Lyshe v. Levy*, 854 F.3d 855, 857 (6th

Cir. 2017). "Standing consists of three elements: '[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.'" *Obermeyer v. McDonough*, No. 1:23-CV-711, 2024 WL 3890686, at *3 (S.D. Ohio Aug. 21, 2024) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)).

**B. Failure to State a Claim – Fed. R. Civ. P. 12(b)(6)**

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) operates to test the sufficiency of the complaint and permits dismissal of a complaint for "failure to state a claim upon which relief can be granted." To show grounds for relief, Fed. R. Civ. P. 8(a) requires that the complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief." While Fed. R. Civ. P. 8 "does not require 'detailed factual allegations,' … it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)).

However, where the complaint contains allegations of fraud, the plaintiff must also meet the heightened pleading standard set forth under Fed. R. Civ. P. 9(b). *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 403 (6th Cir. 2012). Under Rule 9(b), "a party must state with particularity the circumstances constituting fraud or mistake." To meet Rule 9(b)'s heightened particularity requirement, the plaintiff "at a minimum, must 'allege the time, place, and content of the alleged misrepresentation … the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting

from the fraud.'" *Heinrich*, 668 F.3d at 403 (quoting *United States ex rel. Bledsoe v. Cmty Health Sys.*, 342 F.3d 634, 643 (6th Cir. 2003)).

For purposes of a motion to dismiss pursuant to Rule 12(b)(6), the Court must view the complaint in the light most favorable to the plaintiff and take all well-pleaded factual allegations as true. *Tackett v. M & G Polymers*, 561 F.3d 478, 488 (6th Cir. 2009). However, pleadings offering mere "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). In fact, in determining a motion to dismiss, "courts 'are not bound to accept as true a legal conclusion couched as a factual allegation[.]'" *Twombly*, 550 U.S. at 555 (citing *Papasan v. Allain*, 478 U.S. 265 (1986) ). Further, "[f]actual allegations must be enough to raise a right to relief above the speculative level[.]" *Id.*

Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678. A claim is plausible where a "plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Plausibility "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief,'" and the case shall be dismissed. *Id.* (citing Fed. Rule Civ. P. 8(a)(2)).

9

### C. Strike Class Allegations – Fed. R. Civ. P. 23

"The party seeking the class certification bears the burden of proof." *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996). "Given the huge amount of judicial resources expended by class actions, particular care in their issuance is required." *Pipefitters Local 636 v. Blue Cross Blue Shield of Michigan*, 654 F.3d 618, 630 (6th Cir. 2011).

Striking deficient class allegations comports with Rule 23's directive that courts determine whether a class may be certified "[a]t an early practicable time." Fed. R. Civ. P. 23(c)(1)(A). A court may strike class action allegations before a motion for class certification where the complaint itself demonstrates that the requirements for maintaining a class action cannot be met. *Pilgrim v. Universal Health Card, LLC*, 660 F.3d 943, 945 (6th Cir. 2011). A court may properly strike class allegations prior to discovery where discovery would not have "alter[ed] the central defect in th[e] class claim." *Id.* at 949 (affirming the district court's judgment striking class allegations and dismissing a lawsuit prior to discovery, finding that the defect in the class action at issue involved "a largely legal determination" that "no proffered factual development offer[ed] any hope of altering."). "This Court has specifically recognized its authority to strike class allegations prior to the close of discovery when (1) the complaint itself demonstrates the requirements for maintaining a class action cannot be met, and (2) further discovery will not alter the central defect in the class claim." *Amerine v. Ocwen Loan Servicing LLC*, No. 2:14cv15, 2015 U.S. Dist. LEXIS 178248, at *5 (S.D. Ohio Mar. 31, 2015). *See, e,g., Rikos v. Procter & Gamble Co.*, No. 1:11cv226, 2012

10

U.S. Dist. LEXIS 11564, at *4 (S.D. Ohio Feb. 28, 2012) (striking class allegations where the class could not be certified as defined and "no proffered or potential factual development offer[ed] any hope of altering that conclusion.").

However, "courts should exercise caution when striking class action allegations based solely on the pleadings, because class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Geary v. Green Tree Servicing, LLC*, No. 2:14cv522, 2015 U.S. Dist. LEXIS 35059, at *41-42 (S.D. Ohio Mar. 20, 2015). Generally, "a district court should defer decision on class certification issues and allow discovery 'if the existing record is inadequate for resolving the relevant issues.'" *Bearden v. Honeywell Int'l, Inc.*, 720 F. Supp. 2d 932, 942 (M.D. Ten. 2010).

### III. ANALYSIS

To start, Defendant argues that Plaintiff lacks Article III standing because she cannot plausibly allege an injury in fact that is concrete and particularized, nor fairly traceable to Defendant's promotional advertisements. (Doc. 11 at 10-13). <u>The Court agrees.</u>

As stated *supra*, the first element of standing requires that the plaintiff "suffered an injury in fact[.]" *Spokeo, Inc.*, 578 U.S. at 338. "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 339 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). To be "concrete," the "injury must be '*de facto*'; that is, it must actually exist." *Spokeo, Inc.*,

11

578 U.S. at 340. And for an injury to be "particularized," it "must affect the plaintiff in a personal and individual way." *Id.* at 339 (citations omitted). In other words, to establish an injury in fact, a plaintiff must claim that the alleged conduct has resulted (or will result) in some form of actual injury to themselves, first and foremost. *Id.*

Here, Plaintiff alleges the injury she suffered was economic loss resulting from overpayment for LASIK surgery that she believed would be offered to her at a lower cost. (Doc. 10 at ¶¶ 56-61; Doc. 14 at 11). Thus, Plaintiff alleges that her damages are "the difference between the $500 ($250 per eye) she expected to pay based on Defendant's advertising, and the $3910 she actually paid when she succumbed to Defendant's tactics." (Doc. 14 at 11). Because economic loss can constitute an injury-in-fact, the Court takes no issue with the allegations to this point.[2]

However, the second element of standing requires that the injury "is fairly traceable to the challenged conduct of the defendant[.]" *Spokeo, Inc.*, 578 U.S. at 338; *Lujan*, 504 U.S. at 560 ("there must be a causal connection between the injury and the conduct complained of"). It is at this stage that Plaintiff's claim falters.

Specifically, Plaintiff alleges that her economic loss resulted from Defendant's "bait and switch" tactics. Indeed, in the Amended Complaint, Plaintiff states that the

---

[2] There is an argument to be made here that a self-inflicted injury cannot serve as an injury-in-fact. That is, a voluntary purchase in which a thing of value (*e.g.*, money) is exchanged for a service or product is not an "economic loss" but rather a commercial transaction. However, the Sixth Circuit has held that the issue "is best analyzed in terms of traceability." *Lawless v. T. Fin. Servs., LLC*, No. 24-3735, 2025 WL 342810, at *2 (6th Cir. Jan. 30, 2025) (citing *Buchholz v. Meyer Njus Tanick, PA*, 946 F.3d 855, 866 (6th Cir. 2020) ("The D.C. Circuit, for example, has repeatedly stated that self-inflicted injuries are not even injuries in fact…. But the real point is that a self-inflicted injury fails the second standing prerequisite, traceability")). Thus, the Court considers the issue *infra* in its analysis of the second *Spokeo* element.

12

advertised promotional price was "material" in her decision to purchase LASIK surgery. (Doc. 10 at ¶ 56). And she further claims, in no uncertain terms, that "[h]ad [she] known the true cost of the surgery, she would not have had her LASIK surgery performed by Defendant or would not have been willing to pay as much." (*Id.* at ¶ 60). The issue, however, is that <u>Plaintiff **did** know the true cost of the surgery</u>. Indeed, Defendant advised her of the true cost on April 30, 2021, offered a substantial discount on that cost (albeit not as substantial as the promotional price), and then offered her more than two weeks to consider whether she wanted to purchase the surgery for the discounted price (*i.e.*, "the true cost"). (*Id.* at ¶ 58). And, as Plaintiff acknowledges, she did not make her decision hastily. Rather, after two weeks of deliberation, Plaintiff elected to undergo the surgery at the discounted price. (*Id.* at ¶ 59). In other words, while the advertisements may have been what led Plaintiff to make the consultation appointment in the first instance, the decision to pay the true (discounted) cost for the surgery was entirely Plaintiff's own doing.[3]

"At the pleading stage, the plaintiff's burden of 'alleging that their injury is fairly traceable' to the defendant's challenged conduct is 'relatively modest[.]'" *Buchholz v. Meyer Njus Tanick, PA*, 946 F.3d 855, 866 (6th Cir. 2020) (quoting *Bennett v. Spear*, 520 U.S. 154, 171 (1997)). Nevertheless, "there are cases when a plaintiff will fail to meet the traceability standard, such as when an injury is '<u>so completely due to the [plaintiff's]</u>

---

[3] In the motion to dismiss, Defendant notes that the advertisements had actually ceased nearly a year prior to the when Plaintiff claims to have seen them. However, at this stage in the litigation, the Court "view[s] the complaint in the light most favorable to the plaintiff and take[s] all well-pleaded factual allegations as true." *Tackett*, 561 F.3d at 488.

13

own fault as to break the causal chain.'" *Buchholz*, 946 F.3d at 866 (quoting *Petro-Chem Processing, Inc. v. E.P.A.*, 866 F.2d 433, 438 (D.C. Cir. 1989)) (emphasis added).

Here, there is no question that the decision to pay more than the promotional price was Plaintiff's own. And while Plaintiff claims that the advertisements were "material" in her decision to purchase LASIK surgery, this statement cannot logically extend to the cost of the surgery (*i.e.*, her alleged economic loss), given that Plaintiff deliberately chose to pay the higher price. Notably, Plaintiff states that she "made this decision [to pay more] after considering the trouble she had already faced in scheduling and travel and because she felt pressure and fear that if she did not get the surgery at the exact time that she did, she would lose the discount that was being offered." (Doc. 10 at ¶ 59). But these reasons still fail to draw a causal connection between Plaintiff's alleged economic loss and Defendant's conduct.

Specifically, the time and trouble of going to the free consultation was a prerequisite to having the surgery at any cost. Moreover, the fact that Plaintiff spent two weeks deliberating her prior time investment against the price of the surgery only further demonstrates that she thoroughly considered and voluntarily assumed the higher cost. Additionally, the notion that Plaintiff "felt pressure and fear" over losing the $1,000 discount if she did not agree to the surgery has no connection to Defendant's promotional advertisements. More importantly, a time-limited discount is standard practice in virtually every industry. To state the obvious, a reduced sale price is merely an offer, not a means of extortion. And here, Defendant extended the offer and then gave Plaintiff two weeks to decide whether she was interested in proceeding. Any pressure Plaintiff

14

experienced during those two weeks was not the result of Defendant's misconduct, but rather Plaintiff's desire to secure a generous discount on the procedure that she wanted.

In sum, Plaintiff alleges no causal connection between Defendant's advertisements (even <u>initially</u> misleading as they may have been) and her subsequent, deliberate, and thought-out decision to pay the higher cost of LASIK surgery. In other words, Plaintiff economic loss is **not** "fairly traceable to the challenged conduct of the defendant[.]" *Spokeo, Inc.*, 578 U.S. at 338.

Accordingly, Plaintiff lacks standing to bring her claims, and thus the Court lack subject-matter jurisdiction to consider them. And given this lack of jurisdiction, the Court declines to consider the further arguments relating to failure to state a claim and striking class allegations.

## IV. CONCLUSION

Based upon the foregoing, Defendant's motion to dismiss (Doc. 11) is hereby **GRANTED,** and this case is dismissed with prejudice. The Clerk of Court shall docket a final Judgment accordingly.

**IT IS SO ORDERED.**

Date: 3/31/2025

Timothy S. Black
United States District Judge

15